**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 17-cv-0644-WJM-KMT

BRENDA SANDOVAL,

     Plaintiff,

v.

UNUM LIFE INSURANCE COMPANY OF AMERICA, a/k/a UNUM,

     Defendant.

---

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

---

     Plaintiff Brenda Sandoval ("Sandoval") brings this action against Defendant Unum Life Insurance Company of America ("Unum") alleging that Defendant wrongfully denied her disability insurance benefits while she was recuperating and disabled following cervical surgery.  (ECF No. 5.)  Sandoval therefore sues Unum for breach of insurance contract, common law bad faith breach of insurance contract, and unreasonable delay or denial of an insurance claim in violation of Colorado Revised Statutes §§ 10-3-1115 and -1116.  (*Id.*)

     Currently before the Court is Unum's Motion for Partial Summary Judgment (the "Motion").  (ECF No. 48.)[1]  The motion is "partial" in that it only addresses the bad faith and unreasonable delay/denial claims.  Thus, irrespective of how the Court rules on the instant Motion, Sandoval's breach of insurance contract claim will remain set for trial.

---

[1] Defendant's Motion docketed at ECF No. 48 contains redactions of certain personal information.  The full, unredacted version is filed at ECF No. 47 as Level One Restricted.  The Court will cite the publicly available version, except for when referencing redacted information.

For the reasons explained below, the Court grants Defendant's Motion on the common law and statutory bad faith claims, leaving for trial only Sandoval's breach of contract claims against Unum. Given the Court's disposition of this Motion, the Court denies as moot Defendant's Rule 702 Motion to Exclude Opinions and Testimony of Plaintiff's Bad Faith Expert (ECF No. 66). Defendant's Motion *in Limine* to exclude certain evidence (ECF No. 73) remains pending. Finally, given this disposition, the Court will shorten the currently scheduled jury trial to four days.

## I. BACKGROUND

The following factual summary, viewed in the light most favorable to the nonmoving party, is based on the parties' briefs on the Motion and documents submitted in support. These facts are generally undisputed except where noted. All citations to docketed materials are to the page number in the CM/ECF header, which sometimes differs from a document's internal pagination.[2]

Sandoval worked as a Training Supervisor for the Douglas County Motor Vehicle Department. The parties agree that Sandoval's position required her to train staff about the Motor Vehicle Department, vehicle titles, registration, submissions, and laws. Her job also required giving presentations, frequent typing, and occasional standing. (ECF

---

[2] Certain statements and exhibits in these summary judgment proceedings were filed under Restricted Access, Level 1. (ECF No. 50.) *See* D.C.COLO.LCivR 7.2. In this Order, the Court has endeavored to respect Plaintiff's privacy and confidentiality interests in her medical information. Nonetheless, having weighed the parties' confidentiality interests against the public's right of access, the Court finds that any Restricted material quoted or summarized below does not qualify for Restricted Access to the extent quoted or summarized, particularly given the need to provide a proper, publicly available explanation of the Court's decision. *See* D.C.COLO.LCivR 7.2; *cf. Lucero v. Sandia Corp.*, 495 F. App'x 903, 913 (10th Cir. 2012) ("The strongest arguments for [public] access [to court records] apply to materials used as the basis for a judicial decision of the merits of the case, as by summary judgment." (internal quotation marks omitted)).

No. 48 at 3, ¶ 2; ECF No. 55 at 1–2, ¶ 2.)

As an employee, Sandoval was insured under three separate policies: (1) a Group Long Term Disability Policy ("LTD Policy"); (2) a Group Life and Accidental Death and Dismemberment policy ("Life Insurance Policy"); and (3) a Supplemental Life Insurance policy ("Supplemental Life Insurance Policy"). (ECF No. 47 at 2; *see* ECF Nos. 48-5, 48-6, 48-7.)

## A. Medical History

### 1. First Surgery in September 2014

Sandoval developed neck and left arm pain in the summer of 2014, and visited orthopedic surgeon Dr. John Barker at the Rocky Mountain Spine Clinic, P.C., on September 3, 2014. (ECF No. 47-1 at 89–93.) Dr. Barker determined that Sandoval had spinal issues from C5–C7 and recommended surgical intervention. (*Id.* at 92.) On September 16, 2014, Dr. Barker performed an anterior cervical fusion surgery at C5–C7. (*Id.* at 138.)

Within six weeks of the surgery, Sandoval returned to work on a part-time basis and started physical therapy. (*Id.* at 86.) Within three months, Sandoval returned to work full time without restrictions. (*Id.* at 82.) Dr. Barker stated that as of December 2014, Sandoval was "doing very well." (*Id.* at 95.) He released her to return to work "because she was not going to do any heavy bending, lifting or twisting and because her pain was under good control." (*Id.*)

### 2. Second Surgery in October 2015

In February 2015, Sandoval's neck pain began to worsen and she developed

pain in her right arm.  (*Id.* at 79.)  Sandoval again saw Dr. Barker.  He reviewed x-rays of her cervical spine and observed a delayed union and possible development of symptomatic pseudoarthrosis (an abnormal union after a fracture).  (*Id.* at 80.)  He recommended an external bone stimulator to encourage healing of her cervical spine. (*Id.*)  Sandoval used the stimulator for three months but her symptoms continued to worsen.  (*Id.* at 74.)  In June 2015, Dr. Barker reviewed additional x-rays, observed symptomatic pseudoarthrosis at C5–C6 and C6–C7, evidence that the bone fusion was not healing, and recommended posterior cervical fusion.  (*Id.* at 76.)

On September 14, 2015, nearly one year to the day after her first surgery, Dr. Barker saw Sandoval again for increased neck pain, worsening left arm pain, and right arm pain.  (*Id.* at 70.)  X-rays showed a questionable non-union at C5–C6, and a clear non-union at C6–C7, as well as increasing kyphosis (excessive curvature) at C4–C5 above the fusion.  (*Id.* at 72.)  Dr. Barker recommended an anterior and posterior pseudoarthrosis repair from C5–C7, as well as extending the fusion to C4–C5.  (*Id.*)

On October 6, 2015, Sandoval had a second cervical fusion surgery.  (*Id.* at 140.)  Dr. Barker removed the C5–C7 anterior cervical plate, redid the C6–C7 level, added a C4–C5 anterior plate, and placed posterior rod and screws from C4–C7.  (*Id.* at 94, 140–142.)

### 3.  Recovery from Second Surgery

On October 21, 2015, two weeks after the surgery, Sandoval attended a follow-up appointment with Dr. Barker.  (*Id.* at 25.)  He observed that she was "doing very well," as her radiating pain had dissipated and weakness in her left arm resolved.  (*Id.*)

At that time, Sandoval exhibited "5 over 5 motor strength" (normal strength) in her "bilateral upper extremities" (both arms and shoulders). (*Id.* at 26.) Sandoval still had "posterior trapezius pain" (upper back pain). She had stopped taking "all narcotics," but continued to take Tylenol and alternate between Robaxin and Zanaflex (muscle relaxants). (*Id.* at 25.)

Sandoval returned to Dr. Barker on November 23, 2015. (*Id.* at 22.) He noted that she was "continuing to improve" and had been "working on active range of motion of her cervical spine as well as her shoulders." (*Id.*) Sandoval had "some" cervical-induced headaches as well as posterior cervical pain. Sandoval's incision had healed nicely, she continued to have normal strength in her arms and shoulders, and had "intact sensation in all dermatomes bilateral upper extremities" (normal sensory perception on skin on the upper body). (*Id.* at 23.) The parties agree that Dr. Barker's physical examination revealed "very good progress." (ECF No. 47 at 6 ¶ 33; ECF No. 55 at 3, ¶ 33.) Sandoval had not returned to work because of the pain. (ECF No. 47-1 at 23.) She also had not resumed driving because of decreased neck mobility. (*Id.*) Dr. Barker noted as much in his "plan": "She is not able to return to work because she cannot sit for more than 30 min. at a time secondary to posterior cervical pain and she cannot drive." (*Id.* at 24.)

On December 21, 2015, Dr. Barker saw Sandoval again three months after the second surgery. (*Id.* at 19.) Sandoval was "continuing to slowly improve." (*Id.*) Sandoval had normal strength in her shoulders and arms, and had been exercising to increase her range of motion and strengthen her shoulders, though continued to have

shoulder pain and some left arm numbness. (*Id.* at 19–20.) Dr. Barker recommended that Sandoval "increase her activity of her cervical spine" and "start using light barbell weights in order to further rehabilitation." (*Id.* at 21.) He noted that Sandoval was taking Robaxin and could also take ibuprofen for pain management. (*Id.*) Finally, Dr. Barker noted that Sandoval "cannot return to work at this time as she is unable to sit at a desk for more than 30 minutes" and opined that "it is my estimation that she will be unable to return to work where she has to sit at a computer and desk for 8 hours a day until at least April 1." (*Id.*)

Sandoval returned to Dr. Barker's office on February 29, 2016. (*Id.* at 16.) She had been working on her range of motion of her cervical spine and shoulders, but still had some posterior trapezius and cervical pain. (*Id.*) When she had pain in the back of her neck, her left arm tingled and went numb; the tingling sensation resolved when pain improved. (*Id.*) During the physical exam, Sandoval continued to exhibit "5 over 5 motor strength." (*Id.* at 17.) In addition, Dr. Barker noted that Sandoval had "some pain with cervical flexion past 60° and rotation to the right and left" and "no pain with cervical extension." (*Id.*) She had "intact sensation in all dermatomes bilateral upper extremities." (*Id.*) X-rays revealed "no evidence of any loosening of her posterior hardware." (*Id.* at 18.)

Dr. Barker determined that Sandoval was "unable to return to work secondary to her inability to sit for any significant amount of time at a desk or work computer." (*Id.*) At his deposition, Dr. Barker stated that he included this limitation based on Sandoval's report and assessment of her own pain. (ECF No. 60-2 at 4–5.) He instructed

Sandoval to work on her active range of motion, take anti-inflammatory medication and muscle relaxants as needed for pain, and remain out of work until her next evaluation in June. (ECF No. 47-1 at 18.) The June 2016 records, if any, are not in the materials cited by the parties.

One year after the surgery, on October 10, 2016, Sandoval returned to Dr. Barker for evaluation. (This visit occurred between Unum's denial of benefits and Sandoval's appeal, as discussed below in Parts I.B.4–5.) He noted that she continued to have pain in the back of her neck, and neck pain when seated for more than 30 minutes. (*Id.* at 67.) Sandoval had numbness in her left arm, as well as right arm numbness when seated for too long. Household activities, such as cleaning, took her much longer because she required breaks to manage the pain. (*Id.*) At this visit, Sandoval's range of motion of her cervical spine measured extension 30°, flexion 60°, and right and left rotation 40°, but she reported pain with moving. (*Id.* at 69.) She continued to exhibit normal motor strength. On the x-rays, Dr. Barker observed a solid fusion from C4–C7. He noted that Sandoval was "continuing to work on active range of motion of her cervical spine. Unfortunately, she is permanently disabled." (*Id.*)

## B. Insurance Claim

### 1. Applicable Policy Language

As mentioned above, Sandoval was covered under three separate insurance policies by her employer, the LTD Policy, the Life Insurance Policy, and the Supplemental Life Insurance Policy.[3] (ECF No. 48 at 2; *see* ECF Nos. 48-5, 48-6, 48-

---

[3] The Life Insurance Policy and Supplemental Life Insurance Policy—which provide that a person disabled for six months may request a waiver of premium payments—are not at issue

7.) For each month that Sandoval met the policies' definition of "total disability," Sandoval was eligible for a monthly benefit. (ECF No. 48 at 7, ¶ 41.)

The LTD Policy defined "disability" for the first twenty-four months of payments as:

> You are disabled when Unum determines that due to your sickness or injury:
>
> 1.      You are unable to perform the **material and substantial duties** of your **regular occupation** and you are not working in your regular occupation or any other occupation
>
> or,
>
> 2.      You are unable to perform one or more of the material and substantial duties of your regular occupation, and you have a 20% or more loss in your indexed monthly earnings while working in your regular occupation or in any occupation.

(ECF No. 48-5 at 2.) In addition, the patient must be "under regular care of a physician." (*Id.*) The LTD Policy defined "regular occupation" as "the occupation you are routinely performing when your disability begins." (*Id.* at 3.) Unum further clarified that it would "look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (*Id.*)

---

in the present Motion. (ECF No. 48-5 at 2.) Sandoval claims that Unum wrongfully refused to waive her premiums under these policies. (ECF No. 5 at 2–4.) However, she does not appear to assert bad faith denial of the premium waivers. To the extent that Sandoval does assert bad faith denial of a premium waiver, the Court grants summary judgment in favor of Unum. Unum raised the issue in its Motion (*see* ECF No. 48 at 2), and Sandoval completely failed to address it, much less present a genuine issue of material fact regarding the unreasonableness of the denial of premium waivers (*see generally* ECF No. 60).

2.    Submission of the LTD Claim

In late December 2015, Sandoval filed a LTD claim form with Unum under the

LTD Policy ("LTD claim").  (ECF No. 48-4 at 2, 5.)  Sandoval identified her disabling

medical condition as "cerv disc dis w/myelopathy" and Dr. Barker as her sole treating

physician.  (*Id.* at 2–3.)  Sandoval listed her last day of work as October 2, 2015, and

April 1, 2016[4] as the day she expected to return.  (*Id.* at 3–4.)

In early January 2015, Dr. Barker submitted the physician statement for the LTD

claim.  (*Id.* at 14–17.)  He confirmed that he started treating Sandoval on September 3,

2014 for anterior cervical discectomy and fusion (C4–C7) and posterior cervical fusion

(C4–C7).  (*Id.* at 14.)  He also advised that he told Sandoval to stop working in October

2015 and that she could not return to work "until at least [April 1, 2016] as she is unable

to sit at a desk for more than 30 minutes." (*Id.* at 15.)  In support of this limitation, Dr.

Barker explained that "patient is recovering from surgery." (*Id.*)

Shortly thereafter, Douglas County (Sandoval's employer) submitted the

employer statement.  (*Id.* at 18–22.)  The statement identified "training of new staff into

the Motor Vehicle Division" and "multi-week classroom training" as Sandoval's primary

duties.  (*Id.* at 18.)  Douglas County also submitted a formal job description for

Sandoval's position as "Motor Vehicle Trainer/Branch Supervisor." (*Id.* at 21.)  The

physical qualifications for the position "require[d] walking or standing to a significant

degree" and "lift[ing] up to 25 lbs," though "[r]easonable accommodations may be made

---

[4] The date on the form is listed as April 1, 2015, but the parties agree that Sandoval intended April 1, 2016.  (ECF No. 48 at 9, ¶ 48; ECF No. 55 at 4, ¶ 48.)  The Court will thus use that date.

to enable individuals with disabilities to perform the essential functions." (*Id.* at 22.)

Sandoval's claim was assigned to Disability Benefits Specialist Chandra Towns. (*Id.* at 23.) On January 18, 2016, Sandoval provided an oral history to Towns of her symptoms of numbness and pain, diagnosis, and two surgeries. (*Id.* at 4.) She explained that she did not attend physical therapy, but completed home exercises using resistance bands (but not weights) and tried to stretch her back frequently. (*Id.*) Sandoval also explained that her movement was restricted: her hands were weak, she could not move her head left or right, and turning toward her shoulder caused pain. The only head positions that did not cause pain were looking up and straight ahead. (*Id.*) Sandoval also reported that she could not "sit for any period before she has to continually adjust." (*Id.*) Finally, she told Towns that she had discussed possibly returning to work no sooner than April 1, 2016, depending on a reevaluation of her status. (*Id.* at 5.)

In addition to discussing her medical condition, Sandoval and Towns talked about Sandoval's work and job responsibilities. Sandoval noted that the physical demands of her job as a Training Supervisor included giving presentations (often while standing), frequent typing, and teaching. (*Id.*) Sandoval also told Towns that she was a licenced hairstylist with approximately ten customers, whom she retained as clients to keep her license valid. Sandoval explained that she "tried to do some hair a few times but it didn't work out" because it was "too painful." (*Id.* at 5–6.).

Towns confirmed the details of her conversation with Sandoval in a letter dated January 21, 2016, and provided additional information about claims processing. (ECF

No. 48-4 at 24–27.)  She informed Sandoval that Unum would review her medical records to evaluate her claim, and that Sandoval could request an independent medical examination ("IME") if she or her physician disagreed with Unum's assessment.  (*Id.* at 24–25.)  Towns also requested that Sandoval complete and return a Work Experience and Education Questionnaire by March 3, 2016.  (*Id.* at 24.)

       3.    <u>Unum Initial Approval of the LTD Claim</u>

Unum began the new claim triage process for Sandoval's claim with a meeting on January 25, 2016.  (*Id.* at 28.)  In attendance were Towns, her director Jim Farr, nurse clinician Rachelle Mak, and vocational representative Laura Feeney.  (*Id.*)  They determined that the information provided as of that date would support "functional loss," but physical therapy records, x-rays, and additional assessment would be needed to determine ongoing duration of the impairment.  (*Id.* at 29.)  They planned to submit the claim for approval, monitor progress of physical therapy for Sandoval's return to work, and obtain the most recent post-operative diagnostic testing, physical therapy evaluations, and work capacity narrative for functional assessment.  (*Id.* at 29.)

Feeney separately reviewed Sandoval's "occupational identification" to determine her occupation "as it is normally performed in the national economy" on January 26, 2016.  (*Id.* at 30.)  Based on descriptions from Sandoval and her employer, Feeney determined that Sandoval's position was best described as "a dual occupation, combining the material and substantial duties of . . . Employee Training Specialist and . . . Supervisor Branch Office."  (*Id.* at 31.)  At that time, Feeney commented that

> the occupation involves a combination of desk work and
> making training presentations. When doing presentations,
> [Sandoval] may be required to stand for longer periods at

one time; however combined standing and walking would
not exceed 2/3 of the work day, and would allow for brief
periods of sitting. The tasks performed at a desk allow for
brief intermittent breaks throughout the work day to change
position to reduce or prevent discomfort. In addition, the
occupational demands include tasks such as making copies,
sending faxes, and walking to meetings which provide
natural breaks from seated work throughout the work day.

(*Id.* at 33)

On February 4, 2016, Unum approved the claim and informed Sandoval by

phone and letter. (*Id.* at 35–39; ECF No. 47-1 at 1–2, 8–10.) At that time, Towns also

informed Sandoval that she needed her hair dressing earnings from July 1, 2015 to

present to calculate the benefit payment. (ECF No. 47-1 at 35.) That same day,

Sandoval provided by email her monthly income from the hairdressing business, which

varied from $89 to $290 per month. (*Id.* at 41–42.) Her gross income from her salon

from July 2015 to January 2016 varied between $89 and $290 per month. (*Id.* at 42.)

Vicki Riggs, a financial consultant at Unum, commented that those earnings had "no

impact to the claim at this time." (*Id.* at 44.)

Sandoval returned her Work Experience & Education Questionnaire on February

23, 2016. (*Id.* at 46.) Under "additional education or training," Sandoval listed her

cosmetology license as "current." (*Id.*) Under "employment history," Sandoval listed

her position with as a Training Supervisor with Douglas County as well as self-

employment as a "Owner/Cosmetologist" for a salon located in her home with no

employees. (*Id.* at 47.) Her salon served between four and six clients per month and

Sandoval's primary job duties included "standing, cutting & coloring hair, [and] styling."

(*Id.*) Under "computer and technology skills," Sandoval indicated that she used a

computer daily in her job (presumably referring to her position with Douglas County). (*Id.* at 48.)  She also noted that she daily used a "computer or handheld device (smartphone/tablet)" for personal use, including shopping, texting, and social networking.  (*Id.*)

On February 25, 2016, Towns followed up with Sandoval, who reported feeling very sore and experiencing pain after exertion.  (ECF No. 47-1 at 11.)  Sandoval reported that she had not been referred to physical therapy and had an appointment the following week with Dr. Barker for x-rays and follow-up care.

As discussed above in the Medical Summary, Part I.A.2, at Sandoval's February 2016 appointment, Dr. Barker determined that Sandoval could not return to work because she could not sit for a significant amount of time, and that she should remain out of work at least until her next evaluation in June 2016.  (*Id.* at 18.)  Sandoval informed Towns that she was not released to return to work, and that she had not started physical therapy because she could not afford it.  (*Id.* at 11.)

On March 3, 2016, Towns sent a follow-up questionnaire to Dr. Barker's office to obtain further information about Sandoval's ability to work.  (ECF No. 48-4 at 50–51.) On March 22, 2016, Stephanie Moore, an employee of Dr. Barker, filled out the paperwork and returned the completed form with Sandoval's medical records.  (*Id.* at 7–8; ECF No. 47-1 at 13–28.)

On March 23, 2016, after Unum received Sandoval's medical records, Towns once again contacted Sandoval by phone to discuss the claims process.  (ECF No. 47-1 at 28.)  Sandoval told Towns that she had been exercising and stretching with resistance bands and walking on her treadmill approximately 2.5 miles per day.  (*Id.* at

29.)  She reported feeling the need to continually move, lest her arms go numb, and like her recovery had plateaued.  (*Id.*)  While she was driving, turning her head continued to cause pain.  (*Id.*)  Sandoval reported that she was unable to sit for more than 30 minutes.  (*Id.*)  Sandoval informed Towns that she was able to do some housework, such as vacuuming, but experienced soreness afterward.  (*Id.*)  As for her hairstyling business, Sandoval reported that she had "a few" customers for nine years, but that lifting her arms to cut hair or pick up a glass caused pressure on her neck.  (*Id.*)

4.    Unum Review and Denial of the LTD Claim

On March 23, 2016, after the call with Sandoval, Unum staff, including Towns, Farr, Feeney and nurse clinician Megan Yeaton, met to discuss Sandoval's status. (ECF NO. 48-4 at 54.)  They observed that the restrictions and limitations were "overly restrictive based on reported activity level," that five months had passed since Sandoval's second surgery, and that Sandoval's hair salon activity was inconsistent with the restrictions.  (*Id.* at 55.)  Unum instructed Yeaton to follow up with Dr. Barker for a medical office consult.  (*Id.*)  Yeaton's notes from the call with Dr. Barker's office assistant state that "there may be ongoing support from a medical standpoint based on the extent of the surgery; however [Sandoval] is not going to be seen for 2+ months and the current reported activity level lends some support that she may be able to [return to work] prior to the [next office visit] and also there may be an opportunity for a transitional [return to work] plan."  (ECF No. 47-1 at 32.)

Unum called another meeting on April 7, 2016, with Towns, Farr, Feeney, Yeaton, and Dr. Allene Scott.  (*Id.* at 32–33; ECF No. 48-4 at 56–57.)  The notes from that meeting stated that "medical records from the [last office visit on February 29,

14

2016] indicating continued post-operative improvement do not explain why the capacity reported has also not increased." (ECF No. 48-4 at 57.) They concluded that, based on the information provided, it appeared that Sandoval could return to work for at least four hours per day, based on her occupational duties and vocational file discussion. (*Id.*)

Directly after that meeting, Feeney revisited her assessment of the physical demands of Sandoval's vocational. She revised her assessment of the standing and walking activities, and added an explanation of reaching and lifting requirements as well as potential opportunities to change positions from standing and walking. (ECF No. 48-4 at 58–59.) Specifically:

> RE: standing/walking activities: Activities requiring standing and walking include the administrative tasks noted above (retrieving faxes, making copies, filing reports and/or standing to greet customers.) Tasks related to training typically require being on one's feet for a greater part fo the day, and include standing and walking for an hour or more at a time to present information to employees. Training days would not be expected to require combined standing and walking for greater than 2/3 of the work day . . . .
>
> Opportunity to change position from standing and walking: While making presentations, it would be possible to sit briefly to reduce strain, while continuing the presentation. For example, it would be common to have a stool present at the front of the class, and/or to sit while presenting audiovisual materials.
>
> Activities requiring reaching/lifting upward: Materials which are lifted and/or carried include audio visual equipment, training manuals, and presentation equipment such as tripods. It would be common in most office settings to have a cart to assist with transporting these materials. Lifting these items about the should would not be required. Activities requiring reaching upward would include writing on white boards and other surfaces; setting up tripods and

15

audio visual materials; and/or pulling a book or manual from a shelf. These reaching requirements would be of brief duration, and would not include reaching directly overhead.

(*Id.* at 58–59.)

In this lawsuit, Sandoval contends that Feeney failed to address the other physical demands of the job and selectively focused on several aspects of the job, to the exclusion of others, such as the ability to lift 25 pounds, handle a challenging and changing environment, and periodically assume the branch manager role. (ECF No. 55 at 5, ¶ 85.) Feeney did not, however, change her prior assessment that the physical demands of Sandoval's position involved "[e]xerting up to 20 Lbs. of force occasionally, 10 Lbs[.] of force frequently[,] or a negligible amount constantly to Lift, Carry, Push, or Pull objects." (ECF No. 48-4 at 33.) Unum responds that the only physician-imposed restriction or limitation (imposed at Sandoval's February 29, 2016 visit) was Sandoval's inability to sit for more than 30 minutes at a time. (ECF No. 60 at 3, ¶ 85; *see* ECF No. 60-2 at 4–5.)

Unum asked Dr. Scott, an occupational medicine specialist, to contact Dr. Barker about Sandoval's capacity and prognosis. (ECF No. 48-4 at 57.). Dr. Scott inquired by phone and letter about Sandoval's condition and functional abilities. (*Id.* at 61–63.) Instead of responding to the specific questions posted in the letter, Dr. Barker's office faxed Sandoval's most recent office evaluation with a note on the questionnaire saying "please see attached office note." (ECF No. 47-1 at 34–39.)

On May 4, 2016, Dr. Scott reviewed Sandoval's medical files, Town's notes from her conversations with Sandoval, and Feeney's revised vocational assessment, and concluded that the restrictions and limitations were not supported. (*Id.* at 42–43.) In

16

particular, Dr. Scott observed that "continued post-operative improvement documented at office visits is inconsistent with the lack of improvement reported in [Sandoval's] sitting capacity." She also opined that the restrictions and limitations appeared to be based on Sandoval's own reports. Dr. Scott also noted inconsistencies in Sandoval's conversations with Towns; for instance, Sandoval claimed that she was unable to sit or be still for 30 minutes, but also stated that she watched movies at home or at the theater.[5] (*Id.* at 42.) She also found that Sandoval's statement to Dr. Barker that her job required sitting for eight hours a day was inconsistent with Unum's vocational assessment.

Unum's policy is to consider all medical information, including giving deference to the treating physician (here, Dr. Barker) when making a medical determination. (ECF No. 55-2 at 2.) When Unum questions information or an opinion provided by the treating physician, Unum "must attempt to contact" the treating physician. (ECF No. 60-3 at 2.) If no agreement is reached after the contact, as was the case here, Unum is obligated to obtain a second review of the medical information. (*Id.*) Dr. Scott disagreed with Dr. Barker's medical assessment, and recommended referral for a second medical opinion. (ECF No. 47-1 at 43.)

On May 5, 2016, Dr. Edward Dunn—an orthopedic surgeon—reviewed Sandoval's medical file and concurred with Dr. Scott's assessment. (*Id.* at 44–49.) He found that Sandoval's occupation did not require her to sit at a computer for long periods without changing position; that she was capable of doing chores, driving, using

---

[5] Confusingly, Dr. Scott also cites Sandoval's reports of "standing doing hairdressing work" as inconsistent with her reported inability to sit or be still for more than 30 minutes. (ECF No. 47-1 at 42.)

a computer, and doing some hairdressing; that her motor strength was normal and cervical motion was functional; and that she did not require strong medication to manager her pain. (*Id.* at 48.) He thus concluded that Dr. Barker's opinion on restrictions was not consistent with other substantial evidence in the claim file, and that the evidence did not support restrictions and limitations that would preclude Sandoval from performing any of the physical requirements of her job. (*Id.*)

Based on Dr. Scott and Dr. Dunn's assessments, Unum decided to terminate Sandoval's monthly LTD benefits. (ECF No. 48-4 at 64.) On May 12, 2016, Towns informed Sandoval by letter of the adverse decision and her right to appeal by written letter within 180 days. (ECF No. 47-1 at 50–55.)

     5.    <u>Appeal of the LTD Claim Denial</u>

Sandoval retained counsel to appeal the denial of her LTD claim. (*Id.* at 71–72.) After an extension, Sandoval's counsel timely submitted an appeal supported by, among other documents, additional medical records from an October 10, 2016 visit to Dr. Barker, a pain questionnaire completed by Sandoval on December 7, 2016, a statement from Dr. Barker (dated October 12, 2016), a functional capacity evaluation (dated October 26, 2016), and a vocational assessment (dated December 12, 2016). (ECF No. 47-1 at 58–142.) In essence, the appeal argued that Sandoval experienced chronic, disabling pain resulting from the surgery, that her position would require flexibility to change physical positions and to take breaks as needed, and that, as a result, she could not work in a position as a training supervisor because it did not provide her with sufficient flexibility given her teaching and computer-based requirements. (*Id.* at 64.)

18

On January 12, 2017, Unum staff met to discuss the appeal and decided to refer the file to Dr. Jonathan McAllister, an internal medicine specialist. (ECF No. 47-1 at 154–56.) Specifically, Unum staff asked Dr. McAllister (1) if the available medical information supported an inability to perform activities (which corresponded to likely occupational tasks), and (2) if Sandoval's report of severely limiting symptoms was consistent with medical evidence "including clinical exams and diagnostic findings." (*Id.* at 155.)

Dr. McAllister reviewed Sandoval's file and prepared a report. (*Id.* at 157–66.) Dr. McAllister considered Sandoval's abilities in light of the following occupational demands: "light activities including [some lifting of 10 to 20 pounds], frequent sitting, occasional walking, standing, frequent reaching in all directions, constant keyboarding, frequent handling, occasional fingering" given that "combined period of walking and standing would not exceed 2/3's of work day and would allow for brief periods of sitting; desk tasks would allow for brief intermittent breaks throughout the day." (*Id.* at 163.) He found that the medical records did not support Sandoval's inability to perform full time work with those occupational demands. He also opined that the medical records did not reflect the an intensity or frequency of treatment commensurate with Sandoval's reported level of impairment. (*Id.*) Dr. McAllister's opinion was based on the following:

- Recent medical records that did not reflect use of pain medications or other treatments to manage severe, chronic pain;

- Frequency of office visits was inconsistent with reported level of pain;

- No evidence of "other pain behaviors (shifting in chair uncomfortably, crying, etc.)" (*id.* at 164);

- Physical examinations did not show consistent evidence of weakness, atrophy, fasciculation (spontaneous contractions of muscle fibers), hyperreflexia (overactive or overresponsive reflexes), or sensory loss;

- X-rays showing good progress of fusion and no degeneration above or below fusion;

- No MRI or CT scans of cervical spine ("consistent with lack of radicular (pain radiating into the arms) complaints") (*id.*); and

- Functional capacity exam ("FCE") did not provide beginning or ending heart rate levels after each task (making it "difficult to determine whether or not the claimant self limited on specific tasks") (*id.* at 165); and

- Certain FCE results were inconsistent with other medical information. For instance Sandoval performed poorly on a manual dexterity test but other records did not explain why she would have been so limited. Similarly, Sandoval was unable to squat deeply, but her medical records did not evince issues with her lower spine or extremities.

(*Id.* at 164–65.) Importantly, Dr. McAllister determined that the FCE was unreliable as a measure of maximum functional capacity because Sandoval repeatedly stopped some tests, and the results were inconsistent with her medical history. (*Id.* at 165.) Dr. McAllister concluded that the records did not support Sandoval's inability to perform full time work within the occupational demands as of May 11, 2016. (*Id.* at 165.)

Based on Dr. McAllister's report, Connolly determined that Unum's prior determination was correct, and a quality control employee agreed. (ECF No. 48-4 at 81.) On January 30, 2017, Unum informed Sandoval that it upheld its prior

20

determination on Sandoval's LTD claim.  (ECF No. 47-1 at 167–73.)

## C.     Procedural History

On February 16, 2017, Sandoval filed the instant litigation in Colorado state court alleging breach of contract, common law bad faith, and statutory bad faith.  (ECF No. 5.)  Unum thereafter removed the action to this Court based on diversity jurisdiction. (ECF No. 1.)  The Final Trial Preparation Conference in this case is scheduled for September 5, 2018 at 2:00 p.m., and a five-day jury trial is scheduled to commence on September 24, 2018 at 8:30 a.m.  (ECF Nos. 65, 75.)

## II. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or, conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence

and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. V. Catrett*, 477 U.S. 317, 325 (1986). Where the non-movant bears the burden of proof at trial, the non-movant must then point to specific evidence establishing a genuine issue of material fact with regard to each challenged element. *See Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002); *In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).

### III. ANALYSIS

Defendant contends that Plaintiff's common law and statutory bad faith claims fail as a matter of law. Plaintiff disagrees.[6] The Court will address each claim in turn.

### A. Legal Standards for Common Law and Statutory Bad Faith

Under Colorado common law, all insurance contracts "contain[] an implied duty of good faith and fair dealing." *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004). "[A] separate action in tort [arises] when the insurer breaches its duty of good faith and fair dealing." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342

---

[6] The parties agree that there is a factual dispute whether Sandoval was disabled within the meaning of the LTD Policy, Life Insurance Policy, and Supplemental Life Insurance Policy, and that the issue will be resolved at trial by the trier of fact.

(Colo. 2004) (en banc).  When an insured sues the insurer in tort for bad faith breach of insurance contract, "the insured must prove that (1) the insurer acted unreasonably under the circumstances, and (2) the insurer either knowingly or recklessly disregarded the validity of the insured's claim."  *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010); *see Goodson*, 89 P.3d at 415 (citing *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274–75 (Colo. 1985)).

Colorado also provides a statutory claim against insurance companies for unreasonable delay or denial of insurance benefits.  Colo. Rev. Stat. § 10-3-1115(1)(a). The statute explains that a delay or denial is unreasonable when an insurer delays or denies payment of a benefit "without a reasonable basis for that action."  *Id.* § 10-3-1115(2).  Unlike a common law claim, which also requires proof of the insurer's knowledge or reckless disregard, a statutory claim requires only that the insurer delayed or denied benefits without a reasonable basis.  *Baker v. Allied Prop. & Cas. Ins. Co.*, 939 F. Supp. 2d 1091, 1108 (D. Colo. 2013).  If the insured prevails, he or she may recover attorneys fees and twice the cost of the benefit.  *Id.* § 10-3-1116(1).  Thus, the statutory standard under § 1115 is "arguably . . . less onerous" than a common law bad faith claim, and the remedies under § 1116 "more financially threatening."  *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 756 (Colo. App. 2012).

"[T]he reasonableness of an insurer's conduct is measured objectively based on industry standards."  *Zolman v. Pinnacol Assur.*, 261 P.3d 480, 497 (Colo. App. 2011). An insured can prove bad faith by demonstrating that his or her claim was not "fairly debatable."  *Sanderson*, 251 P.3d at 1217–18.  In other words, if an insurer's reason for delay or denial was "fairly debatable," it weights against finding that an insurer acted

unreasonably. *Id.* However, "fair debatability is not a threshold inquiry that is outcome determinative as a matter of law, nor is it both the beginning and the end of the analysis in a bad faith case." *Id.* at 1218. Even if the claim is fairly debatable, an insured could still prove bad faith through evidence of, for example, among other things:

- total failure to investigate the claim, *see* 14 *Couch on Insurance* § 207:24 (3d ed.);

- failure to conduct a reasonable investigation based on all available information, *see Allen*, 102 P.3d at 344; *see also* 14 *Couch on Insurance* § 207:25 ("Implicit in the duty to investigate is the requirement that the investigation be adequate and fair.");

- "not providing a reasonable explanation of a denial of a claim," *Allen*, 102 P.3d at 344–45 (affirming bad faith verdict because, among other things, the evidence showed that the insurer "concluded its investigation without exploring [certain] conflicting statements . . . or by talking with [a relevant witness]"); or

- in-house policies that reward employees for defeating claims, *see Zolman*, 261 P.3d at 500; *see also Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279 (Ariz. 2000).

A finding that an insurer did not unreasonably deny or delay an insured's claim is fatal to both the common law and statutory claims. *Wagner v. Am. Family Mut. Ins. Co.*, 569 F. App'x 574, 580 (10th Cir. 2014) ("[Plaintiff] failed to meet a required element of both her bad faith claims because [insurer] acted reasonably in denying coverage."); *Glacier Const. Co. v. Travelers Prop. Cas. Co. of Am.*, 569 F. App'x 582, 591 (10th Cir. 2014).

24

The Colorado Supreme Court has held that an insurance bad faith plaintiff does not need expert testimony regarding reasonableness in all cases. *Allen*, 102 P.3d at 344–45. Rather, in some cases the reasonableness of an investigation is within a lay juror's competency to judge. *See id.* at 345 (holding, in the context of a car accident investigation, that "[t]he reasonableness of an insurer's investigation into the underlying events . . . is not a technical question and does not require additional professional training beyond the knowledge of the average juror").[7]

"What is reasonable under the circumstances is ordinarily a question of fact for the jury." *Baumann v. Am. Family Mut. Ins. Co.*, 2012 WL 122850, at *4 (D. Colo. Jan. 17, 2012). "However, in appropriate circumstances, as when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Vaccaro*, 275 P.3d at 760.

**B.    Common Law Bad Faith Claim**

   1.    Reasonableness of Defendant's Denial

At the summary judgment stage, Unum has the initial burden of showing an absence of evidence to support Sandoval's case. *See Celotex*, 477 U.S. at 326. Unum argues that Sandoval has failed to adduce any evidence of Unum's unreasonableness in terminating Sandoval's LTD benefits. Unum cites evidence that it had several doctors review Sandoval's medical records, her statements, her job requirements, and

---

[7] This could be perceived as a question of evidence, meaning that the Colorado Supreme Court's holding usually would not bind this Court. *See Blanke v. Alexander*, 152 F.3d 1224, 1231 (10th Cir. 1998) ("The admissibility of evidence in diversity cases in federal court is generally governed by federal law."). But even if *Allen* is not binding, the undersigned finds it persuasive, as have other judges in this District. *See, e.g.*, *Windsor Court, LLC v. Am. Family Mut. Ins. Co.*, 2013 WL 799589, at *4 n.3 (D. Colo. Mar. 5, 2013) (Arguello, J.).

her additional submissions on appeal. (*See* ECF No. 47-1 at 42–49, 157–66.) On this basis, Unum contends that Sandoval's claim was, at a minimum, fairly debatable. (ECF No. 48 at 26–27.) Unum also argues that its claims review process was reasonable. (*Id.* at 27–30.) Unum collected medical records, interviewed Sandoval, obtained an occupation description from Sandoval's employer, had a vocational specialist review Sandoval's job position and determine the physical requirements of the position, contacted the treating physician, employed internal quality control measures, and assigned new claims staff on appeal. (*See* ECF No. 48 at 28–29.)

In response, Sandoval—the party who will bear the burden of proof at trial—must point to specific evidence to establish a genuine issue of material fact. *See Reed*, 312 F.3d at 1194. Sandoval contends that Unum's process for deciding her claim was unreasonable because:

- Unum ignored the treating physician's statements regarding Sandoval's reported level of pain;

- Unum violated its own policy when it failed to defer to Sandoval's treating physician;

- All medical opinions in support of denial were offered by medical personnel who worked for Unum;

- Unum failed to resolve conflicting statements between Unum's doctors and the treating physician;

- Unum failed to address the conflict between Sandoval's FCE and Unum's vocational expert;

- Unum did not conduct an independent medical exam of Sandoval;

26

- Two of Unum's three reviewing physicians were not trained in the same specialty as Sandoval's treating physician; and

- Unum violated its own policy by failing to assign an orthopedic surgeon to review Sandoval's appeal.

(ECF No. 55 at 10–14.) Ultimately, Sandoval's arguments boil down to three points: Unum ignored the position of the treating physician; Unum failed to resolve conflicting statements and simply picked opinions that favored its position; and Unum's doctors were under-qualified to evaluate the claim. Sandoval also argues that her claim could be construed as "fairly debatable" only because Unum failed to investigate conflicting opinions between Sandoval's medical providers and Unum employees. (*Id.* at 13.)

After a thorough and careful review of the record, the Court concludes that Sandoval's arguments are unavailing because they do not establish that there is a genuine dispute of material fact that, if resolved in Sandoval's favor, would allow a jury to find in her favor.

Sandoval argues that Unum ignored its own policy of deferring to the treating physician and instead sided with its own internal reviewers. While Unum does have such a policy of deference, the policy does not mandate agreeing with the treating practitioner in every case. (*See* ECF No. 60-3 at 2.) Unum has established a procedure for when its analysis differs from that of the treating physician, which includes attempting to contact the treating physician and obtaining a second opinion if agreement is not reached. (*Id.*) Here, Unum followed that very procedure. Dr. Scott reached out to Dr. Barker's office. (*See* ECF No. 48-4 at 57, 61–63.) Because this contact did not resolve the differences of opinion, Dr. Dunn provided a second opinion.

27

(ECF No. 47-1 at 43.)  Sandoval does not contest that this policy is unreasonable, or that Unum failed to adhere to its procedure for not deferring to a treating physician.  As such, Sandoval has not presented evidence that, in this instance, Unum's decision not to unconditionally defer to the treating physician was unreasonable.

Sandoval argues that Unum failed to investigate conflicts of opinion between Dr. Barker, her treating physician, and those of the Unum physician reviewers, as well as between Sandoval's Functional Capacity Evaluation and the vocation expert.  She claims that Unum, without justification, simply favored the opinions of its own medical consultants over the medical providers relied upon by  Sandoval.  This claim is not supported by the record.  Unum's reviewing doctors, particularly Dr. McAllister on appeal, explained why they found the restrictions inconsistent with the medical records. (ECF No. 47-1 at 164–65; *see also id.* at 42–43 (Dr. Scott); *id.* at 44-49 (Dr. Dunn).) The points raised by the doctors demonstrate that the claim was, at a minimum, fairly debatable.

Moreover, Sandoval has provided no explanation as to *why* such a review analyzing the differences would be required, or that it was unreasonable to not investigate such differences.  She does not cite Unum policy, expert testimony on insurance industry standards, or argue that it is a question of common sense reasonableness to be decided by the jury.  *See Allen*, 102 P.3d at 344–45 (finding that an expert is not required when reasonableness of an investigation is within a lay juror's competency).  In short, Sandoval has provided no evidence which she could present at trial to show that Unum's failure to investigate differences of medical opinions was unreasonable–an issue on which she clearly has the burden on summary judgment.

Nor does Sandoval establish that industry standard required Unum to complete an independent medical exam to resolve conflicting opinions. While Unum could have conducted such an exam, Sandoval cites nothing to suggest that an exam is required to resolve conflicting analysis between the treating physician and Unum's doctors. While such an exam could have been helpful to determine Sandoval's pain levels or functional capacity, Sandoval has not established that it was unreasonable (as objectively determined by reference to to industry standards) not to conduct such an exam. Absent any evidence that Unum's failure to perform an independent medical exam is objectively unreasonable (other than Sandoval's mere claim that it is so), a reasonable jury could not find that Unum's handling of Sandoval's claim was unreasonable.

Finally, Sandoval attempts to create a fact question of whether Unum's doctors were unqualified to review her claim and appeal. Without support, Sandoval claims that Unum violated its company policy by failing to assign a doctor of the same specialty as the surgeon to review Sandoval's appeal. (ECF No. 55 at 13.) Sandoval does not provide support for this claim regarding Unum's policy. Instead, Sandoval earlier states that Dr. Thomas Hashway (another Unum doctor) stated in his deposition that the primary criteria for assigning a physician on appeal is the specialty of the doctor. (ECF No. 55 at 8, ¶ 126; ECF No. 60 at 5, ¶ 126.) The doctor assigned to the appeal, Dr. McAllister, was certified in internal medicine. Sandoval does not support her statement that Dr. McAllister was unqualified to review her claim with any case law, internal Unum policy, or expert testimony. Nor does Sandoval explain why Dr. Scott or Dr. Dunn were unqualified to render an opinion on Sandoval's initial claim. Given the lack of evidence

in support of Sandoval's claim, Sandoval has not carried her burden on summary judgment.

Sandoval also claims that Unum's review on appeal was not thorough because the reviewing doctor did not have a background in pain management. However, Sandoval has not established, by reference to Unum policy, her own expert report, or case law, that a physician must specialize in pain management (such as an anesthesiologist) to make that determination. Nor has she argued that it is a matter of common sense best left to the determination of the jury. Rather, she argues that whether the doctors were qualified creates a triable issue of fact. However, in making this argument, Sandoval points to no evidence that she could present at trial to support her position. On this issue, as well, Sandoval has failed to carry her burden at the summary judgment phase.

The Court is troubled, however, that Unum appeared to rely only on its own employees in evaluating and denying Sandoval's LTD claim. The factual record submitted also causes additional concern, particularly that Unum's vocational expert altered her analysis of the physical requirements of Sandoval's job mere moments after the initial meeting in which Unum decided that Sandoval could return to work at least part time. In any event, the parties do not address this point, and there is no claim that such a determination was unreasonable.

Ultimately, Sandoval's total failure to cite to *any* evidence supporting her position in the argument section of the brief is the undoing of her bad faith claim. Without presenting specific evidence in favor of her argument, Sandoval cannot show that Unum acted unreasonably. Absent a genuine dispute of material fact, supported by

evidence admissible at trial, the Court is compelled to grant Defendant's Motion on Sandoval's common law bad faith claim.

      2.    <u>Reckless Disregard</u>

Given the Court's resolution on the unreasonableness prong of the common law claim, the Court need not address the parties' arguments on reckless disregard.

## C.    Statutory Bad Faith Claim

The Court also grants summary judgment on Sandoval's statutory bad faith claim in favor of Unum. Unlike the common law claim, a statutory bad faith claim requires only a showing of unreasonable delay or denial of benefits. The standard for unreasonableness is the same for common law and statutory bad faith claims. *See Wagner*, 569 F. App'x at 580 . As discussed above, Unum did not unreasonably delay or deny Sandoval's benefits under her LTD claim.

The parties dispute damages available under the statutory bad faith claim. Because the Court finds that there was no unreasonable delay or denial of insurance benefits, the Court need not address the parties' arguments regarding availability of future unaccrued benefits.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendant's Partial Motion for Summary Judgment (ECF No. 48) is GRANTED;

2.    Given the Court's Order on this Motion, Defendant's Fed. R. Evid. 702 Motion to Exclude Opinions and Testimony of Plaintiff's Bad Faith Expert, Lee Rosenbaum, Esq. (ECF No. 66) is DENIED AS MOOT; and

3.    This matter REMAINS SET for a Final Trial Preparation Conference on September 5, 2018 at 2:00 PM and a jury trial to commence on September 24, 2018 at 8:30 AM, both in Courtroom A801.  However, given the disposition on summary judgment, the time allocated for trial is reduced to **FOUR DAYS**.

Dated this 29th day of August, 2018.

BY THE COURT:

_____
William J. Martinez
United States District Judge